IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CAMILLE A. DREILING,                    )
                                        )
                Plaintiff,              )
                                        )
v.                                      )        No.  06-1065-WEB
                                        )
MOWERY CLINIC, LLC,                     )
                                        )
                Defendant.              )
_____)

**<u>Memorandum and Order</u>**

Plaintiff Camille Dreiling was employed as a phlebotomist with defendant Mowery Clinic beginning in May of 1996.  In November of 2004, after she received a flu shot, plaintiff developed transverse myelitis, a spinal cord inflammation that, among other things, affected her balance.  Plaintiff was hospitalized and was granted leave by defendant under the Family and Medical Leave Act ("FMLA").  Plaintiff alleges that she was cleared by her doctor to return to work in December of 2004 provided she could sit down while performing her duties.  She contends she was refused such an accommodation from the defendant.  Plaintiff's FMLA leave expired on February 2, 2005, and her employment was terminated on February 22, 2005. Plaintiff subsequently filed this action claiming the defendant violated her rights under the Americans with Disabilities Act ("ADA") and the FMLA.  The matter is now before the court on the defendant's motion for summary judgment.  For the reasons stated herein, the court finds the motion for summary judgment should be granted.

I. *<u>Uncontroverted Facts</u>*.

The court finds the following facts to be uncontroverted for purposes of summary

judgment.  The court notes that plaintiff has attempted to controvert a number of facts merely by referring generally to her statement of additional facts.  This does not constitute "refer[ring] with particularity to those portions of the record upon which the opposing parties relies" as required by local rules.  *See* D.Kan.R. 56.1(b)(1).  Where the court has been able to identify evidence in the record showing a genuine dispute, the court has adopted plaintiff's version of the facts for purposes of summary judgment.  But the court will not engage in an unguided search of the record to see if it can locate evidence in support of plaintiff's allegations.  *See Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000).

1. Camille Dreiling, the plaintiff, was employed at Mowery Clinic, LLC, the defendant, since May 1996.

2. Plaintiff was employed as a phlebotomist.

3. Defendant terminated plaintiff's employment on February 22, 2005.

4. Plaintiff claims that defendant failed to grant her an accommodation which she says is reasonable—allowing her to sit on a stool while performing her duties.

5. Plaintiff claims that Defendant terminated plaintiff for exercise of her rights under the Family Medical Leave Act by failing to return her to work.

6. Plaintiff requested and was granted Family and Medical Leave Act leave on or about November 10, 2004.

7. Plaintiff admitted receiving twelve weeks of FMLA leave.

8. Under the clinic's policy on FMLA leave, plaintiff was required to give periodic reports every two weeks to the clinic about what her status was and her intent to return to work. Plaintiff said if the doctors gave her a slip, she would turn it into the clinic. [Pl. Dep. 54-55 (Att.

2).].

9. Plaintiff said she was told by Dr. Dennis that Dr. Davis would be the physician who would determine when she could return to work. [Pl. Dep. 57 (Att. 2).].

10. Plaintiff's leave under FMLA expired on or about February 2, 2005.

11. Plaintiff recognized that she had a written job description that applied to her during the entire time she was a phlebotomist at Mowery Clinic, LLC.

12. The job description for plaintiff's position at Mowery Clinic, LLC, sets forth the role of a phlebotomist as one who draws blood from patients and maintains a general calmness and trust of the patients.

13. The physical demands for plaintiff's position as described in the job description are:

Requires full range of body motion including manual and finger dexterity and eye-hand coordination. Frequent walking, sitting, bending, and standing required for extended periods of time. Lifts and carries items weighing up to 25 pounds. Requires visual acuity and normal color perception.

14. The description of the essential activities to be performed by plaintiff as a phlebotomist are set forth in the job description as:

1. Prepares equipment to efficiently collect blood products.
2. Performs venipuncture and capillary punctures on patients. Identifies and labels specimens.
3. Instructs patients on urine collection procedures.
4. Performs bleeding time tests.
5. Cleans and sterilizes supplies and work area. Contact with infectious patients, material and associated odors.
6. Inventories supplies and keeps a stock of supplies and notifies the proper personnel to place orders.
7. Enters patient orders into the computer and keeps a current list of standing orders and routinely has offices review this list of standing orders. Work requires critical accuracy, identification of patients, specimen labeling at a

3

fast pace and in stress situations.
8. Communicates with patients of all ages in a manner which promotes a comfortable phlebotomy and in a professional manner at all times.
9. Communicates with co-workers and employees in a manner which promotes a highly team oriented approach; interact with various medical personnel.
10. Performs phlebotomy and other tasks according to Laboratory safety policies.
11. Maintains patient confidentiality.
12. Additional hours as needed, sometimes with little notice especially late in the eve.
13. Performs related work as required.
[Dep. Ex. 2 (Att. 3)].

15. The performance requirements set forth in the job description are:

Knowledge of laboratory techniques to perform routine blood and urine tests. Skill in performing venipuncture and capillary puncture on adult, neonatal and pediatric patients. Instruct patients in all urine and stool collection procedures. Maintain knowledge of all routine container and minimum volumes required for specimen collection. Knowledge of looking up ecoteric testing from other laboratories and supplying proper test numbers. Basic computer and keyboarding skills. Skill in establishing and maintaining effective working relationships with patients, medical staff, and the public. Ability to follow written protocols. Ability to work independently and communicate clearly.

16. Plaintiff acknowledged that her duties as a phlebotomist required her to be able to control unruly or unwilling children when they were being tested.

17. Plaintiff acknowledged that two or three phlebotomists had to handle up to as many as many as 182 patients per day between them.

18. Plaintiff acknowledged and admitted that her duties, with minor exceptions, included all 13 items on her job description.

19. Prior to November 4, 2004, plaintiff was able to perform the essential function of her position without difficulty.

4

20. In November of 2004, flu shots were made available to the employees. It was up to the employees as to whether to have the shot; it was not mandatory, but for those who were involved with patients on a daily basis, the inoculation was recommended. A small ratio of employees opted to have the shot and plaintiff was one of those. [Speilman Dep. 44-46 (Att. 10)].

21. On November 4, 2004, plaintiff got a flu shot.

22. On November 10, 2004, plaintiff was admitted to the hospital.

23. Plaintiff was subsequently diagnosed as suffering from transverse myelitis as a result of an adverse reaction to her flu shot.

24. Transverse myelitis is a generic term for inflamed spinal cord; in most cases it is due to the immune system reacting to a viral infection and the spinal cord is attacked by its own immune system.

25. Plaintiff's physicians treating her after her November hospitalization included Dr. David Dennis and Dr. Trent Davis.

26. Dr. Dennis first saw plaintiff in connection with her presenting problem on November 10, 2004. She could barely walk. Dr. Dennis examined her and immediately admitted her to the hospital and diagnosed her as having developed transverse myelitis based in part on the history of an influenza injection some four days prior to the onset of symptoms.

27. Plaintiff was in acute care for three to four days and then went to rehabilitation for a few days and was released to go home with a walker to ambulate. It was not safe for her to walk independently of that assistive device.

28. Dr. Dennis, in concert with neurologist Dr. Davis, continued to treat plaintiff

during December of 2004 and January 2005.

29. In December of 2004, plaintiff continued to have extreme difficulty with balance and difficulty with lower extremity weakness. The left leg was weaker than the right which made it extremely difficult for her to stand up and sit down and to get the correct angle for drawing patients' blood. [Dennis Dep. 34-35 (Att. 8)].

30. At that time plaintiff was experiencing significant back pain which would have been a significant impediment to being able to work as a phlebotomist. [Dennis Dep. 35-36 (Att. 8).]

31. Dr. Davis is a board-certified neurologist in private practice in Salina, Kansas, and is not and never has been associated with Mowery Clinic, LLC.

32. In connection with her illness, Dr. Davis first saw plaintiff on January 7, 2005. At that time, she was using a walker and estimated she could only go six feet without the aid of a walker. She was having trouble with her speech and would lose her train of thought.

33. On this first visit, plaintiff said her left arm was affected; had bladder urgency and was having some accidents during the day. She was also having a vibrating sensation that would travel down her legs and involuntary leg spasms. [Davis Dep. 13 (Att. 4)].

34. Dr. Davis next saw plaintiff on January 31, 2005, and her symptoms were essentially the same; she was still using a walker all the time. She would use a cane in physical therapy but she felt most comfortable with the walker. Any return of her strength at that time was minimal; she suffered from blurred vision, her arms tired easily; she had leg weakness, was numb from the hip to the toes and there was pain in the left hip. She indicated she had numbness in the calf down, and down the middle of her leg it felt like an electric shock sensation. [Davis

6

Dep. 17-19 (Att. 4)]. Dr. Davis found, as an objective finding, plaintiff was unsteady at times. [Davis Dep. 21 (Att. 4)].

35. Taphne a/k/a Taffy Speilman has been an employee of Mowery Clinic since 2001. She was Human Resource Director until April 2005. She was the HR Director for approximately three and a half to four years. She reported to Mr. Wilson, the Clinic administrator. [Speilman Dep. 19-22 (Att. 10)].

36. Mowery Clinic averaged 160 employees while she was HR Director.

37. Ms. Speilman received special training for the HR position. That training addressed both the Family and Medical Leave Act and the Americans With Disability Act. Ms. Speilman was the primary person responsible for administering the FMLA while she was HR Director. Several people with disabilities or who became disabled were accommodated. The decisions as to how to accommodate employees who were disabled or had a disability came about as a result of discussion with Mr. Wilson as he was more knowledgeable than she.

38. Valerie Kasselman was the supervisor for the laboratory, the phlebotomist, and the working techs. She reports to Mr. Wilson.

39. Ms. Kasselman has supervised plaintiff the entire time plaintiff worked at Mowery Clinic.

40. Prior to the decision to terminate plaintiff, Ms. Speilman was brought notes from plaintiff's supervisor. They were doctor notes from Dr. Kossow (plaintiff's physical therapy physician) and Dr. Trent Davis, stating that plaintiff was unable to return to work. One of the notes states it would be three to six months before she would be able to return to work. That raised the question in Ms. Speilman's mind of how she was going to cover the absence for

another six months. That led to a discussion with Mr. Wilson. [Speilman Dep. 59-60 (Att.10); Deposition Exhibit 5 (Att. 5) Pl. Dep. 61 (Att. 2).].

41. On January 5, 2005, Dr. Davis wrote a sick slip note to plaintiff's employer which is identified as a part of Deposition Ex. 5 which said

> To employer, Camille is not ready to return to work. I'm anticipating a three to six month window during which she'll improve to be able to perform her duties.

[Davis Dep. 21-22 (Att. 4); Dep. Ex. 5 (Att. 5)].

<u>Personnel Policies of Mowery Clinic</u>.

42. Darrell Wilson is the Chief Administrative Officer for Mowery Clinic, LLC ("Mowery Clinic"). He is hired by and reports to the Executive Committee, which is a committee of physicians elected by the physician owners of the Limited Liability Company.

43. He is given authority to hire and fire employees. He sometimes seek guidance from the Executive Committee but his decisions on termination of employees are not required to be endorsed or voted on by the Executive Committee.

44. He is responsible for implementation and enforcement of the formal policies and procedures at Mowery Clinic. Some, if not all, of the Clinic policies are published in both a personnel and employee handbook. These publications are given to each employee and reviewed with each employee at least once a year. In examining the personnel file of the plaintiff, Camille Dreiling, Wilson saw documents that all employees are required to sign acknowledging they have reviewed the handbook. Attached to the declaration of Wilson as Exhibit A is a page from plaintiff's personnel file (MDR 00048), which indicates that plaintiff reviewed the employee handbook.

45. The employee handbook contains two policies approved, adopted, and followed at Mowery Clinic, which are pertinent to this case. The first policy, entitled "Nondiscrimination Against and Accommodation of Individuals with Disabilities" (MDR 00355), is attached to the declaration of Wilson as Exhibit B. This policy is one that declares Mowery Clinic's and Wilson's personal commitment to adhere to both the letter and spirit of the requirements of the laws and regulations relating to the Americans With Disabilities Act and other applicable state and federal laws.

46. The second applicable policy, which is also contained in the employee handbook, entitled "Family and Medical Leaves of Absence" (MDR 00361-364), is attached to Wilson's declaration as Exhibit C. This document expresses and explains the policy and procedure followed by Mowery Clinic in granting appropriate family and medical leave to its employees.

The policy spells out the entitlements of employees and the procedures to be followed in applying for leave. It also sets out the requirements to be met by the employee both while on leave and when seeking to return from leave. On page 19 (MDR 00363), the policy reads:

> Before you will be permitted to return from medical leave, you will be required to present Mowery Clinic with a note from your physician indicating that you are capable of returning to work and performing the essential functions of your position, with or without reasonable accommodation. Where required, Mowery Clinic will consider making reasonable accommodation for any disability you may have in accordance with applicable laws.

47. Mowery contends the provision is designed to protect, so much as possible, the health and safety of Mowery Clinic employees who have been on leave, Mowery Clinic patients, and other employees who will be in contact with the returning employee, and to safeguard the legitimate legal and business interests of Mowery Clinic.   It also asserts the policy is part of

Mowery Clinic's commitment to their insurance carriers to reduce exposure regarding workers compensation or liability claims, and that the Clinic attempts to scrupulously follow the quoted provisions from the policy so that all similarly-situated employees are treated equally and so that Mowery Clinic can safeguard the personal safety of their employees and patients. Wilson followed both of the above-referenced policies while dealing with plaintiff. [Wilson Declaration, ¶ 4 (Att. 13).]

The Decision to Terminate Plaintiff.

48. Ms. Speilman had direct supervision for the float nurses and the float receptionist. Her first and foremost job duty was to make sure that all offices were covered with adequate personnel. She was responsible for sick and vacation leave and handling personnel issues that arose.

49. Ms. Speilman knew she would have to provide coverage for plaintiff's position but thought initially they would be talking about a couple of weeks. She worked with plaintiff's supervisor, Valerie Kasselman, to move around some of her techs and phlebotomists at the beginning. As time progressed and plaintiff could not return to work, some of the float nurses who had previous phlebotomy experience were used to cover the phlebotomy position. Ms. Kasselman was the supervisor and covering the vacancy caused by plaintiff was primarily her responsibility.

50. In order to cover for plaintiff's vacancy, Ms. Kasselman utilized the current staff and borrowed an R.N. to assist in drawing blood. Plaintiff's leave caused morale problems because there were no vacations and it was a busy time and everyone felt very pressured. Ms. Kasselman spoke to her staff and told them there was no way plaintiff could come back before

the first of the year. In January, plaintiff told Ms. Kasselman that her physician would not release her yet. Ms. Kasselman had a staff member who was having a gall bladder attack that needed attention. She needed surgery in February. [Kasselman Dep. 15-18 (Att. 12)].

51. In January, Ms. Kasselman spoke to the HR Director inquiring about what to do about staffing as she was getting to the point she had no one.

52. Lab employees were becoming very stressed because they were quite overworked; becoming disgruntled because they were having to work their days off, either rearrange or not take vacations, and the clinic was having to scramble every day to attempt to cover the patient load. In Ms. Speilman's words, "we were drowning."

53. Plaintiff acknowledged that it was hard on the other staff members to cover for her absence. It meant they would have additional patients to serve.

54. Plaintiff had exhausted her FMLA leave and the clinic was scrambling for coverage of the phlebotomy position and it was causing a hardship on other employees. Float nurses were being used which meant they were unable to service their patients. Ms. Speilman needed somehow to cover the situation in the lab.

55. Plaintiff acknowledged that she understood holding per position open wasn't fair to the other employees but she thought the clinic should be loyal to her as she hadn't asked to be put in the position she was in.

56. Dr. Dennis has been associated with Mowery Clinic since 1988.

57. Mowery Clinic is a limited liability company in which Dr. Dennis is one of the shareholders. He has been the President of Mowery Clinic since January 2006 and has been on the Executive Committee a number of years. As President, he chairs the monthly meeting of the

11

Executive Committee and meets frequently with the Administrator, Darrell Wilson, as needed and at least once a week. The Executive Committee reviews personnel issues. The Executive Committee is composed of six to seven physicians who are elected. The Administrator has primary responsibility for employee discipline issues and has authority to terminate an employee without getting the approval from the Executive Committee. Typically, prior to termination, the proposed termination would be run by the President and a report made to the Executive Committee, often subsequent to dismissal.

58. On January 31, 2005, Dr. Davis wrote a report to Dr. Dennis which is Exhibit 33. In that letter he said she was many months away from maximal improvement. His report said in part that "She admits that she would like to go back to her work, but admits that her gait is not as steady and reliable as she would need." [Davis Dep. 23-25 (Att. 4); Dep. Ex. 33 (Att. 6)].

59. Dr. Davis testified that the only note he sent to Mowery Clinic was the note dated January 31, 2005, indicating that it would be three to six months before she would be able to return to employment. At the time he wrote it, she was not, in his judgment, able to return to full-time employment and he never sent anyone anything to indicate his judgment was otherwise. [Davis Dep. 48-49 (Att. 4)].

60. Dr. Davis testified that there were no notes that he was aware of where he informed her employer or any one with her employer that she was able to return to "full time, part time work or any work with any kind of limitation, restriction or condition." [Davis Dep. 47-48 (Att. 4)].

61. Darrell Wilson was familiar with and knows the plaintiff. He had seen her around the clinic when she came in for appointments, and knew that she could not walk without using a

walker. He was aware that all of the times he had seen her recently at the clinic she was utilizing

a walker. [Wilson Declaration, ¶ 5 (Att. 13).]

62. Wilson made the decision to terminate plaintiff's employment with Mowery

Clinic. Prior to arriving at his decision, he consulted with the following people:

Valerie Kasselman, plaintiff's supervisor
Taphne, a/k/a/ Taffy Speilman, Human Resources Director
Jenny Von Lintel, Assistant Administrator
Dr. David Dennis, member of Mowery Clinic's Executive Committee and one of
plaintiff's physicians.

63. They discussed the essential functions of plaintiff's position as spelled out in

Deposition Exhibit 2 (MDR 00090) and made part of the Wilson Declaration by reference. It

was unanimously agreed that plaintiff was not in physical condition to be able to perform the

essential functions of her position and that she did not have a release to return to work with or

without restrictions. In addition, they discussed whether they could continue without filling her

vacant position. Wilson was made aware of the low morale among plaintiff's co-workers due to

the additional workload, the fact the laboratory could not allow vacations, and the staffing

problems caused by plaintiff's absence. To be completely staffed, the lab ordinarily needs two

full-time and one part-time phlebotomists. Mowery Clinic had been under a hiring freeze for

some period and could not hire additional staff. The lab met the short-term need by temporarily

convincing the part-time phlebotomist to go full-time, initiated a no time off rule, and borrowed

RNs and other personnel to fill the gap. [Wilson Declaration, ¶ 7 (Att. 13).]

64. The last communication Mowery Clinic had from plaintiff's neurologist, Dr.

Trent Davis, is dated January 31, 2005, and is part of Deposition Exhibit 5 (MDR 00007). In this

communication, Dr. Davis stated he anticipated a three to six month window until plaintiff could

improve enough to perform her duties. [Wilson Declaration, ¶8 (Att. 13).]

65. Ms. Kasselman, Ms. Speilman, Ms. Von Lintel, and Mr. Wilson discussed whether there were any jobs in the clinic plaintiff could do in her condition. According to Wilson, since the clinic had nothing that could accommodate her condition, and she did not have a release to return to work under any conditions and since the clinic would be in limbo for at least three to six months more in a crisis situation, Wilson decided to terminate plaintiff. Wilson also wanted to make sure plaintiff understood that when she was sufficiently recovered to be able to return to work and to perform the functions of a job that she could handle, they would consider her for reemployment.  [Wilson Declaration, ¶ 9 (Att. 13).]

66. Wilson took his decision to the Executive Committee for discussion. Wilson did this primarily because of his concern with the fact that plaintiff had received the flu shot that caused her adverse reaction at the clinic and was diagnosed with transverse myelitis from the clinic while an employee. Those same concerns had caused Wilson to take an extra interest in her illness and her prognosis for recovery.

67. The Executive Committee met on February 21, 2005, and heard Wilson's plans to terminate plaintiff. While there was no vote, there was a discussion among the physicians in attendance that Wilson make clear to plaintiff that if she recovered to the point where her physician felt she could work for the clinic, the clinic would give every consideration to her application. An excerpt of the minutes of the Executive Committee meeting of February 21, 2005, states as follows:

> The other issue involved a need for a decision to be confirmed to officially terminate an employee who is not presently able to physically perform the work duties of her job. This employee has exhausted all sources of paid leave and the twelve week period of

14

unpaid time that is required by FMLA (Family Medical Leave Act) for an employee's job position to remain available to them has also now expired. It was reported that the current written prognosis provided by this employee's neurologist is that she is not and will not be able to return and perform the normal work activities required for the job position for another three to six months. This employee's supervisor and the other staff members in the department where she had worked until mid-November of last year have exhausted their ability to continue covering the job responsibilities in this employee's absence without having a permanent replacement. Consequently, in order for the clinic to fill this position with new permanent employee, it is necessary that an unconditionally vacant position be made available. The only reasonably prudent alternative to accomplish this without future complications and unknown consequences is to officially terminate this temporarily disabled employee at this time so that another employee who is presently able to perform the duties of the job can be hired. The committee agreed that after the clinic has fulfilled its responsibility regarding governmental compliance that officially terminating the employee is appropriate and necessary business action to take but that a sincere written gesture should be provided to this individual indicating a willingness on the part of the clinic to re-hire her for a vacant position that she is qualified and capable to perform following her full recovery from her present physical incapacitation. [Wilson Declaration, ¶ 11 (Att. 13).]

68. Dr. Dennis recalled that during the meeting of the Medical Executive Committee there was an issue of people covering for plaintiff and that they were getting tired of doing that and if plaintiff were to be given a sit-down job there would have to be other people covering for her. Dr. Dennis recalled a concern about other people having a bad attitude toward plaintiff on that basis.

69. Ms. Kasselman testified that there were statements from the other phlebotomist to the effect that bringing plaintiff back and letting her try to do the job while sitting would be detrimental to the morale of the lab and turn others into "gofers" for her. Ms. Kasselman said that she thought someone would have to do part of plaintiff's job in bringing samples back to the

lab. [Kasselman Dep. 24-30 (Att. 12).]

70. Ms. Speilman attended the Executive Committee meeting where the discussion was had on the reasons for terminating plaintiff. The recommendation was explained to the Committee because plaintiff was an employee whose physicians would not release her to return to work, that it was necessary to cover her vacant position, and that it was neither feasible nor economical to attempt to hire a temporary phlebotomist and then to have to let that person go if plaintiff were ever able to return to work. Ms. Speilman explained that in order to return to work, it is required that plaintiff have a release from her physicians which she did not have. [Speilman Dep. 62-69 (Att. 10)].

71. Ms. Speilman said that if a physician gave a less than complete release and put restrictions on a phlebotomist, the restrictions would be examined and compared against the job description to determine if the employee could perform the phlebotomy job. [Speilman Dep. 87-88 (Att. 10)].

72. Wilson declares that in his decision and action in terminating plaintiff, he was and is convinced that:

a) His action was consistent with Mowery Clinic's policy that requires a medical release to return to return to work, a policy that he has uniformly followed;

b) He considered whether there were any available positions plaintiff could fill if a physician stated she could come back to work with or without restrictions, and determined there was no way Mowery Clinic could accommodate her present condition;

16

c) The fact that plaintiff had utilized Family Medical Leave did not enter into the decision, except that Wilson wanted to be uniform in the way he administered the policy;

d) Wilson decided to terminate plaintiff for the sole reason that based on all available information plaintiff could not presently nor in the foreseeable future perform the essential function of her job;

e) Wilson was convinced then and is now that if plaintiff had been allowed to return to her position, the patients at the clinic would be exposed to a situation where she was physically unable to deal with children, frail, elderly, or very ill patients. Wilson simply was not willing to expose them or plaintiff to that danger. [Wilson Declaration, ¶ 14 (Att. 13); Dennis Dep. 37-41 (Att. 8); Speilman Dep. 62-69 (Att. 10).]

73. Wilson caused the letter dated February 21, 2005, and designated Deposition Exhibit 6, to be rewritten by Ms. Speilman to reflect the extra concern of the Executive Committee, which had not been adequately expressed in an earlier draft.

74. On February 22, 2005, Ms. Kasselman, Ms. Speilman, and Mr. Wilson met with plaintiff and her husband. Mr. Wilson explained that the clinic had to refill her position—that her prolonged absence caused undue hardship to her co-workers and to the clinic. Wilson told plaintiff that everyone at the clinic wanted her to get well and that when a physician indicated that she could return to work, they would give full consideration to her re-employment.

75. It was during this meeting that plaintiff asked why she couldn't do her job while sitting and was told that it was due to dangers to patients, children, etc. from her lack of strength.

17

Ms. Speilman had earlier told her that there were no available positions which were purely sitdown positions and which did not have a lot of bending, stretching, and lifting in the clinic and plaintiff was reminded that it was impossible to place her without a release from her physicians. [Speilman Dep. 66-67, 74-75 (Att. 10)].

76. Ms. Kasselman was present at the termination meeting with plaintiff and her husband. Mr. Wilson read the termination letter. At the time, the clinic was under a hiring freeze, not adding new staff, but only replacing personnel and Mr. Wilson explained that the clinic had been so short in the lab they needed to hire someone. Plaintiff said she could do the job sitting down and Ms. Kasselman responded, "no, you couldn't Camille." [Kasselman Dep. 21-22 (Att. 12)].

77. Dr. Dennis was shown Deposition Exhibit 2 at his deposition and, after reading it, agreed that it was a good general statement of the role of a phlebotomist. He answered that as of February 2005, plaintiff absolutely could not meet the description of "Requires full range of body motion including manual and finger dexterity and eye-hand coordination." Although she had eye-hand coordination she could not, by virtue of imbalance and lower extremity weakness, meet the rest of the requirement. Dr. Dennis said a phlebotomist needs to have full range of body motion because of the need to draw blood from different angles for different sized patients, including children, babies, and adults. In his opinion, an adjustable stool would not address nor accommodate the need to be able to respond quickly to changes in position, such as from a child or an infant. [Dennis Dep. 41-43 (Att. 8); Dep. Ex. 2 (Att. 3)].

78. Dr. Dennis agreed with the job description requirement which required "Frequent walking, sitting, bending and standing for extended periods of time." He stated that plaintiff

18

would have difficulty walking, bending, and standing, and because of her back pain, plaintiff would have trouble sitting. In his opinion, plaintiff should not sit for more than five or ten minutes without standing and changing position. Dr. Dennis felt the maximum amount of time that plaintiff would have been able to stand was in the range of 10 to 15 minutes. Even though plaintiff "graduated" from a walker to a cane as of February 14, 2005, she would continue to have significant difficulty in standing up. [Dennis Dep. 44-47 (Att. 8)].

79. Dr. Dennis, when asked what plaintiff would have to lift and carry that weighed twenty-five pounds as described in the job description, replied that his only knowledge of that would be that she may have to assist with carrying a child or infant to place on a table to draw blood. [Dennis Dep. 47-48 (Att. 8)].

80. Dr. Dennis said that because of the issues of having to be at different angles and, in some cases, having to actually temporarily, physically restrain particularly younger patients who would not be able to hold still for the venipuncture, plaintiff would not have been able to comply with the second item on the job description–"Performs venipuncture and capillary punctures on patients." In his opinion, Dr. Dennis said it would have been extremely difficult for her to perform bleeding time tests because that requires ongoing monitoring of the patient and particularly for younger children, with the child moving around, it would have been difficult to comply with the described task. [Dennis Dep. 50-51 (Att. 8)].

81. Dr. Dennis said because of inadequate strength in standing and balance, she could not comply with the requirement "Cleans and sterilizes supplies and work area. Contact with infectious patients, material and associated odors." He said it would be difficult to do this even with a cane because of the balance issues. [Dennis Dep. 52-53 (Att. 8)].

19

82. Because of her balance issues, Dr. Dennis would be concerned about plaintiff's inability to move and avoid contact with infectious material which caused him to have concern for her safety. [Dennis Dep. 53-54 (Att. 8)].

83. Dr. Dennis' opinion is that allowing plaintiff to sit on a stool to label specimens would be inadequate as an accommodation because of the fast pace required at the lab.  He stated that her inability to change positions rapidly would keep her from being able to comply with Item Number 10 on the job description. [Dennis Dep. 55-58 (Att. 8)].

84. Dr. Davis was familiar with the layout of the lab where plaintiff worked and had a long discussion with her about whether she could go back to her job as a phlebotomist. He said the job required a person do a lot of turning and reaching and walking and he did not think her gait was steady enough or secure enough to do that without the risk of falling. [Davis Dep. 22-23 (Att. 4)].

85. Ms. Speilman had conversations with plaintiff on a couple of occasions in Ms. Speilman's office. In one of those conversations or in the meeting in which plaintiff was terminated, plaintiff asked if she could do her job sitting down. Ms. Speilman told her

> You know, Camille, you are—what would happen if you had a
> patient that you were drawing blood on, they got dizzy, they got
> sick, you were the only one there, would you be able to handle
> them? Would you be able to catch them before they fell on the
> floor? What would you do, you know, with a baby or an infant?. . .
> In our office in the clinic there are no positions that don't require
> bending or lifting or stretching or anything like that, and you are,
> you know, looking at reinjuring, you know, yourself if you did
> those things without being fully capacitated or fully better.
> [Speilman Dep. 57-59 (Att.10)].

86. In response to a question by plaintiff's lawyer about his knowledge that Mowery Clinic was not willing to modify plaintiff's job requirements, Dr. Davis replied in part

> She had told me—I asked her what modifications could be made. I
> told her myself that if you have to go back there and stand the way
> that techs normally do, it's going to be dangerous. You're going to
> fall, you're going to break the tubes of blood and all that goes
> along with doing that. You have to get major modifications.

Dr. Davis further said he knew what her job was and she couldn't do her job at that point. He

said she would basically have to have everything on a table and that he would have been nervous

if the job involves having to stand up, reach up or turn. [Davis Dep. 52-55 (Att. 4)].

87. Dr. Davis said plaintiff could have sat at a desk and answered a phone, but that if she

were a receptionist whose duties included restocking shelves and going to get supplies, she could

not have done it. He described what she could do as "I don't have to get up in the performance

of my job duty." [Davis Dep. 56-57 (Att. 4)].

88. Dr. Davis said he had never seen plaintiff's job description. He was read a

portion of plaintiff's deposition where he (Dr. Davis) said, "he noticed the girls turning real fast

from the computer to the patient, from the patient to the lab, . . . . and he (Dr. Davis) just thought

I wouldn't be good at that type of work." He was asked if that was an accurate reflection of what

plaintiff's condition was in April 2005 and Dr. Davis said, "Yes. I would have thought at that

point in time if she had to do that, she probably would have had a high risk of falling." [Davis

Dep. 30-31 (Att. 4)].

89. Dr. Davis was then asked about the requirements on the written job description

which he said he had never seen. He acknowledged plaintiff did not have full range of body

motion; could not do frequent walking, sitting, bending and standing for extended periods of

time. He said she could not in her condition carry items weighing up to 25 pounds. [Davis Dep.

60-61 (Att. 4)].

90. Dr. Davis concluded that he would share Mowery Clinic's concern about plaintiff's ability to handle children who become unruly or people who pass out when they see blood or have blood drawn. He said he shared that concern at the time he wrote Exhibit 32 and that he believed it was a legitimate concern. [Davis Dep. 62-63 (Att. 4)].

91. Plaintiff's supervisor reported that plaintiff could not have done the job sitting down. The clinic has patients that have to be lifted onto a table and that have to be restrained. Also there are older people in wheelchairs and with walkers who need help getting in and out. It takes agility and range of motion to perform these tasks. Some people faint and you need to be able to catch these people. These were Ms. Kasselman's concerns that plaintiff could not have taken care of these tasks. [Kasselman Dep. 30-31 (Att. 12)].

92. Plaintiff filed and signed an application for short term disability and received short term disability payments for six months. The application was dated 11-12-04 and signed by plaintiff. [Pl. Dep. 126-128 (Att. 2); Deposition Ex. 10 (Att. 17).]

93. Plaintiff signed two attending physician statements in connection with her disability insurance. The first was dated February 10, 2005, and represented that she was not presently able to return to either part-time or full-time work. In response to the question of when you expect to work plaintiff wrote "Three to six months." She also represented that her physician had said on her last visit that it would be another three to six months before she could return to either full- or part-time employment. [ Pl. Dep. 135-137 (Att. 2); Deposition Exhibit 12 (Att. 18).]

94. On the form filed on 5-6-05 plaintiff represented that her doctor had not yet released her to return to work. [Pl. Dep. 137-139 (Att. 2).]

22

95. Plaintiff admitted that since her termination on February 22, 2005, she had never made contact with the defendant to see if they had openings for a phlebotomist and never applied to the clinic for a job.

96. [controverted].

97. Dr. Dennis had a physician relationship with plaintiff for two to three years. He recalls treating her for obesity, back pain and typical minor colds, infections and migraine headaches and depression. [Dennis Dep. 18-19 (Att. 8)]. He sent plaintiff a letter withdrawing as her physician on September 20, 2005, as a result of charges she made against the clinic in her August filings with EEOC and KHRC [(Att. 15 &16)], which Dr. Dennis felt caused him to have a conflict of interest. The charges that plaintiff made which caused the conflict were the allegations of failure to accommodate plaintiff's disability.

98. Plaintiff's condition according to Dr. Dennis as of September 20, 2005, was that she continued to have instability with walking and imbalance issues as well as weakness of the lower extremities. [Dennis Dep. 22 (Att. 8)]. When asked if there were any other physical problems that she was experiencing at that time which would have affected her ability to do her job, Dr. Dennis replied that she also had significant back pain which would have been another significant impediment to her being able to work as a phlebotomist. [Dennis Dep. 35-36 (Att. 8)].

99. Dr. Trent Davis continued to treat the plaintiff. He next saw plaintiff on March 7, 2005. During this visit she told the doctor that she had been terminated from work and that she was told there were no sedentary positions available. She said she went from a walker to a cane on February 14, 2005.

100. Dr. Davis next saw plaintiff on April 18, 2005, and even though he knew from her visit in March that she had been terminated from her position, she requested a note saying she could have worked in a sitting job several months back in December. [Davis Dep. 29-30 (Att. 4)].

101. At the April appointment Dr. Davis told the plaintiff to have her attorney write him a letter telling him what questions he wanted answered. Dr. Davis has no recollection of ever receiving such a letter. Dr. Davis has no recollection of writing a letter in response to plaintiff's request. [Davis Dep. 31-33 (Att. 4)].

102. Dr. Davis signed Exhibit 16 which was a form for the Kansas Department of Labor. It bears his signature, is in his handwriting and is dated May 23, 2005. On question number 3 in response to the question of when plaintiff would be able to return to full work, he wrote n/a or not applicable. The answer n/a was written because she was not able to return to work full-time. He explained that he expected her to be able to return to full-time work on or about September, 2005. He further stated she had been unable to work full-time since November 10, 2004. [Davis Dep. 33-35 (Att. 4); Dep. Ex. 16 (Att. 7)].

103. Dr. Davis agreed that in May 2005 plaintiff's standing endurance would be 5 to 15 minutes a day and that was all. [Davis Dep. 36 (Att. 4)].

104. Dr. Davis saw plaintiff on June 30, 2005. He explained that plaintiff told him she was wobbly but better than she was in May. He said her balance comes and goes and she can still fall fairly easily. Among other things, he observed that she had a spastic gait, which means the legs are very stiff.  He said she had the same symptoms she had before. [Davis Dep. 36-38 (Att. 4)].

105. Dr. Davis next saw plaintiff on September 9, 2005, at which time he indicated no improvement since her last appointment. Plaintiff had fallen a couple of times although she was now walking without a cane. She was having short-term memory problems. She had developed a tremor in her hands. [Davis Dep. 40-42 (Att. 4)].

106. Dr. Davis saw plaintiff in December 2005 and plaintiff told Dr. Davis that she had decided she was going to stay home and not seek employment. [Davis Dep. 44 (Att. 4)].

107. On April 14, 2006, Dr. Davis wrote a letter to Dr. Herron, who became her internal medicine physician when plaintiff left the Mowery Clinic. The letter described plaintiff's physical condition at that time. Dr. Davis explained that plaintiff's balance had been a problem throughout the course of treatment. She still continued to lose her balance and was now having trouble with her right knee. Dr. Davis said he had advised plaintiff that she should begin to approach life from the perspective that that is the way she'll have to function from a neuromuscular standpoint and she should start making the necessary adjustments to her lifestyle and plans. He said her condition would be conducive to work that did not depend on looking up or balance. He further observed that she might have to go to school for many of those types of work. [Davis Dep. 45-46 (Att. 4) Deposition Ex. 40 (Att. 19).].

108. During his deposition, plaintiff's lawyer asked the doctor whether plaintiff's symptoms might not have occurred if she had been working. The doctor replied if she had been employed she would have just traded one set of symptoms for another. [Davis Dep. 49-51 (Att. 4)].

109. Davis last saw plaintiff on October 11, 2006, the day before his deposition.

110. Plaintiff's condition on October 11, 2006, was that, although she was showing

steady improvement, she was in no means back to baseline. [Davis Dep. 10 (Att. 4)].

111. Plaintiff thought she should have been recovered by then but Dr. Davis told her that she should really be in for a long haul because it would not be unusual for this to take a year and a half to two years to get better.

112. Dr. Davis is still trying to determine whether plaintiff is suffering from latent multiple sclerosis which was activated by a flu shot or whether it is true transverse myelitis. [Davis Dep. 15 (Att. 4)].

113. If it is multiple sclerosis, Dr. Davis would expect it to get worse as it is a progressive disease. [Davis Dep.15-16 (Att. 4)].

*Plaintiff's Statement of Additional Facts*.

1. Camille was born in Newton, Kansas in 1967, and graduated from Wichita Northwest High School in 1985.

2. Camille started as a phlebotomist in 1994 at St. John's Hospital in Salina, working for Dr. Smith, a pathologist.

3. Camille received "on-the-job training" for her phlebotomist duties at St. John's, where she served as a phlebotomist for two years.

4. Camille began to work at Mowery as a phlebotomist in 1996.

5. Camille admitted that sometimes children were hard to draw blood from, because they would fight. However, Camille stated that ninety percent of the time, there were two phlebotomists or lab techs present to help draw an unruly child. One person would help hold the arm and hold the body and the other phlebotomist would draw the blood. Pl. Depo. At 15-16. Additionally, if someone in a wheelchair needed blood drawn and their arm was at an awkward

26

angle, another phlebotomist would come over and hold their arm to help. (Id. pp. 16-17).

6. Camille testified that Mowery, prior to her illness, under certain circumstances, was already allowing phlebotomists to sit down when drawing blood. (Id. pp. 29-30).  Specifically, for chemo patients, who were seated in recliners that sat kind of low, plaintiff would lower herself down to administer to them.  She would sit on a stool to draw blood from them.  *Id*. at 30.

7. Camille received the flu vaccine on November 4, 2004, which was administered by Linda Hoffman, the Mowery safety nurse. The flu shot was recommended by Mowery for all employees that worked with the public. Camille suffered transverse myelitis as a result of the flu vaccine, and was admitted to the hospital for several days. (Id. pp. 32-40, 43).

8. After suffering from significant numbness in her legs, Camille began to improve greatly over time as a result of rehabilitative efforts, such as physical therapy.

9. According to plaintiff, Dr. Dennis or Dr. Davis stated that if Valerie Kasselman, her direct supervisor, won't let her come back to work with no restrictions, then he would just write a note saying that she couldn't come back to work yet.[1]  Pl. Depo. at 55.  Camille thought that Dr. Trent Davis, her neurologist, would release her to work in December of 2005. When plaintiff told Dr. Dennis in late 2005 that she thought she could return to work, he said he didn't think Val would let her, because she had said no.  According to plaintiff, Val indicated she wanted

---

[1] Plaintiff asserts that Valerie Kasselman told her she couldn't come back to work with restrictions.  The cited portions of plaintiff's deposition, however, show that Ms. Kasselman visited plaintiff in the hospital at a time when plaintiff was unable to walk, and that plaintiff asked if Ms. Kasselman would have a problem with plaintiff coming back to work with her legs this way, to which Ms. Kasselman allegedly responded that plaintiff wasn't coming back to work.  *Id*. at 62.  Plaintiff further stated that when she later discussed with Ms. Kasselman how her legs were progressing, Ms. Kasselman stated that plaintiff couldn't come back to work the way she was.  *Id*. at 62-63.

27

plaintiff to be able to stand and walk without the restriction of needing a walker or cane and a stool. *Id*. at 99. Plaintiff said there was no reason why she couldn't sit down to draw blood, to which Dennis replied that it was up to Val, and that she had already said no. *Id*. at 58-59. Camille asked Dr. Dennis if he could "pull some strings" so that she could come back to work. (Id. pp. 55-59, 62).

10. When Camille would talk to Taphne Speilman, the HR director for Mowery, she would tell Camille to focus on getting better, and that the job would be there when she was ready to come back. Every time Camille spoke with Ms. Speilman, she would ask if there were some other job she could do, and Ms. Speilman's response would always be in the negative.

11. Camille told Ms. Kasselman that she could come back to work and was ready to do so.

12. Whenever Camille would provide a doctor's note to Mowery, Ms. Kasselman would give her a hard time, and was always informing her of what a hardship it was to have her gone from work.

13. Camille told Darrell Wilson, Mowery administrator, that it was possible for her to draw blood from someone who was sitting down. Mowery stated that they would not allow that to happen at their lab. Camille also indicated to Mr. Wilson that other area offices and hospitals allowed their phlebotomists to sit down. (Id. pp. 82-83, 100-105, 107-08).

14. Camille told Mr. Wilson that the drawing chairs were easily lowerable so that Camille could draw sitting down. She further said it was so easy to do, that she could remove the platform under the drawing chair herself. (Id. pp. 83-85, 100-05, 107-08).

15. Camille also stated that everyone in the lab could draw blood, including the lab techs

and Ms. Kasselman. When trouble drawing would arise, another phlebotomist or lab tech would help out. (Id. p. 85).

16. Camille stated that Mowery was unwilling to attempt any of her suggested accommodations, which Camille felt was unreasonable and discriminatory. (Id. pp. 86, 91-93, 120).

17. After Camille was fired from Mowery, she looked for several jobs, including phlebotomist positions, but was never successful in her search. She had trouble getting employment, because people perceived her as handicapped.

18. Camille stated that it would not be a problem for her to take samples to the lab, because the containers were essentially unbreakable.

19. Camille has been able to walk without the use of her walker since February 2005, and without an assistive device since July 2005.

20. Camille stated that she could have returned to work with accommodations at the time she was fired. She feels that she could still perform that job to this day. (Id. p.120-21).

21. Camille received disability benefits in the short term from Mowery, and also received unemployment benefits through the state of Kansas.

22. Camille indicated on the forms that she was disabled.  When asked in her deposition whether the representation on those forms that she was unable work was accurate, plaintiff testified:

> A.  I put no on that because Doctor Dennis kept me on this because
> – he kept me on this short-term disability because the clinic
> wouldn't let me come back to work – or Val wouldn't let me come
> back to work without restrictions – or with restrictions, and so he
> kept me on this.

Q.  So you are saying that it was not true that you were unable to work to the present?

A.  I was still walking with my walker and the clinic wouldn't let me come back, and I was still thinking I had my job and I had this note and the neurologist wouldn't let me go back to the lab because of what Val had said.  I filled this out truthfully, so this is correct.

Pl. Depo. at 137.

23.  A great deal of the disability forms and unemployment forms were filled out by Camille's doctors and Mowery employees. (Id. pp. 126-147).

24.  Camille can now stand for ten to fifteen minutes at a time, and can walk for five to fifteen minutes.

25.  Dr. David Dennis, the president of Mowery, stated that Mowery's disability policy requires Mowery to make efforts to accommodate an employee's disability.

26.  Dr. Dennis admits that he does not know what Camille's current medical status is. (Id. p. 22).

27.  Dr. Dennis testified that Camille was fired because Mowery felt that she could not perform the essential functions of her job. (Id. pp. 38, 57).

28.  Dr. Dennis stated that Mowery determined that it would not be possible for them to accommodate Camille's disability. (Id. p. 40).

29-30.  With regard to the physical demands listed in the job description for plaintiff's position, Dr. Dennis admitted that as of February 2005, Camille had hand-eye coordination and good visual acuity.  With regard to defendant's list of 13 essential activities for a phlebotomist, he testified he believed plaintiff could prepare equipment to collect blood products (#1);  could identify and label specimens (part of #2);  could instruct patients on urine collection procedures

30

(#3);  could inventory supplies and notify the proper personnel to place orders (#6);  could enter patient orders in the computer and keep a list of standing orders, although labeling at a fast pace might be difficult for her (#7); could communicate appropriately with patients (#8); could communicate appropriately with co-workers (#9); could maintain patient confidentiality (#11); and could work additional hours as needed (#12).

Dr. Dennis testified that in his opinion, plaintiff did not have full range of body motion by virtue of her imbalance and lower extremity weakness.  With regard to the essential activities, he testified plaintiff would not be able to perform venipuncture and capillary puncture on patients (#2) because of having to be at different angles and temporarily restrain younger patients; that it would have been extremely difficult for plaintiff to perform bleeding time tests (#4) particularly on younger children who move around; she could not sterilize the work area (#5) because of the difficulty of standing and the strength and balance necessary to clean; and could not perform phlebotomy and other tasks according to lab safety policies because of having to change positions rapidly, particularly on younger patients.  He testified that activity number 13, "performs related work as required," was too vague to assess.  Dennis Depo. Pp. 42-56.

31. Valerie Kasselman is the lab supervisor at Mowery, and supervised Camille the entire time she was at Mowery.

32. Ms. Kasselman admitted that it bothered her when Camille had to absent from work, because it put stress on the other lab employees.

33. Ms. Kasselman told Camille that she could not do the phlebotomist job sitting down.

34. Ms. Kasselman admitted that Camille could have carried samples to the lab by walking with a cane and carrying her free hand to carry a sample, although she wasn't sure

plaintiff could keep up the pace necessary to do so.  She conceded plaintiff probably could have been accommodated in this regard by having the other phlebotomists take plaintiff's sample back to the lab when they took their own samples back.  Kasselman Depo. At 29-31.

Kasselman testified that although there were many patients on whom plaintiff could draw blood from a seated position, the clinic could not accommodate plaintiff by allowing her to work from that position because they had younger patients who had to be lifted onto a table, they had older patients with wheelchairs and walkers who needed help getting in and out and collecting urine samples; and they had people who fainted and they had to be able to catch those people. *Id*. at 31.  Additionally, she testified that over the noon hour and from 5:00 p.m. to 5:30 p.m. there is only a single phlebotomist, although she conceded there were a couple of other of people back in the testing lab at those times.  *Id*. at 36-37.

35. Taphne Speilman was the HR director for Mowery at the time Camille was employed there.

36. Ms. Speilman admitted that Mowery clinic had made accommodations for other employees, including the use of special equipment, moving an individual's office upstairs, and parking accommodations.

37. Ms. Speilman considered Camille to be a whiner.

38. Ms. Speilman admitted that there were other positions at the clinic that a person in Camille's alleged condition could physically perform with certain accommodations, such as operator, receptionist, C.N.A. and medical assistant. (Id. pp. 67-68).  Plaintiff cites no evidence, however, that any such positions were available at or near the time plaintiff was terminated.

39. Ms. Speilman testified that the lab techs are capable of drawing blood, and that there

is always a backup phlebotomist on duty.

40. Ms. Speilman testified that in her opinion a phlebotomist would still be able to do the job under certain types of restrictions from their doctor, such as a requirement that the person take periodic breaks to sit down and rest. (Id. pp. 87-88).

41. Dr. Trent Davis is a neurologist who has been treating Camille for the majority of her illness of transverse myelitis.

42. Dr. Davis felt that Camille's workstation would have to be adapted for her to draw blood.

43. Dr. Davis' assessment was that Camille was suffering from transverse myelitis. (Id. p. 39).  He still has not ruled out the possibility that she has multiple sclerosis.

44. Dr. Davis testified he told plaintiff that if she had to go back to work and stand the way the "techs" normally do, it was going to be dangerous.  He said "you're going to fall, you're going to break the tubes of blood, and all the problems that go along with doing that.  You have to get major modifications."  He testified that if she could have a job where she could sit (although probably not eight hours a day) he would have been willing to try a sitting job, because he "knew what her job was and knew she couldn't do her job at that point."  Davis Depo. At 53-54.  He would have tried releasing her to a job that had everything located so that it was level where she was sitting, but not if the job involved a lot of or even frequent having to stand up, reach up, or turn.  *Id*. at 54-55.

II. *Summary of Arguments*.

Defendant argues that plaintiff is not a "qualified individual" under the ADA because she was unable to perform the essential functions of the phlebotomist job, with or without reasonable

accommodation.  The Clinic argues plaintiff could not meet the physical demands of the position – including the requirements of having a full range of body motion; frequent walking, bending and standing; and lifting and carrying items weighing up to 25 pounds.  It argues she could not perform these requirements even with her suggested accommodation of being seated.  It contends the uncontroverted evidence shows she could not perform essential functions such as controlling children who move around, catching persons who become faint, and getting in position to draw blood from wheelchair-bound patients.  Defendant argues that "if plaintiff were fair to herself, she would admit she has recognized her own limitations, caused as a result of a tragic reaction which made it impossible for her to continue to serve young, sick, frail patients" and "she would not want someone in her condition responsible for her care and she should not be in a position to violate the first rule of the medical community – do no harm."  Doc. 31 at 33.

Defendant contends there is no reasonable accommodation that would allow plaintiff to do the job, and argues that her suggestions of having other employees perform the functions plaintiff could not do are not reasonable accommodations.  It also contends plaintiff's previous claims of temporary total disability are inconsistent with her claims that she could have performed the job with an accommodation.  It argues that its termination of plaintiff was non-discriminatory and did not violate the ADA.  As for plaintiff's claim under the FMLA, defendant argues that case law makes clear it is not unlawful to terminate an employee who is unable to provide a "fitness for duty" certification after exhausting all FMLA leave.

In response, plaintiff argues that the testimony shows she could have performed " the vast majority" of essential functions without any accommodation and "the other functions of the job could be met with easy, reasonable accommodations from Mowery."  Doc. 38 at 17-18.  Plaintiff

argues that Dr. Davis testified she could have done her job sitting down, but he did not give her a release because the Clinic told her they would accept nothing but a full release.  *Id.* at 19.  She argues the drawing chairs could have easily been lowered to allow her to draw more people while sitting down, that Ms. Speilman testified it would have been reasonable for plaintiff to sit down and take breaks, and that it would have been easy to have someone else take her samples to the lab.  She asserts that there was always a backup phlebotomist on duty and that all of the lab techs were capable of drawing blood.  She argues she could have performed every single job function with accommodations.

Plaintiff recognizes that an employer is not generally required to reallocate essential job duties or to have other employees assist a disabled employee, but she argues the Clinic was already allowing phlebotomists to sit for some procedures, which shows that it simply "did not want to extend that accommodation to her."  *Id.* at 20.  Moreover, she argues some phlebotomists routinely assisted each other with children and other difficult patients, showing that her requested accommodation in that regard was reasonable.

Plaintiff argues Mowery cannot show a non-discriminatory reason for terminating her.  With regard to Mowery's claim that it terminated her for failing to provide a medical release in accordance with its policy, she argues such an assertion conflicts with Dr. Dennis' testimony that she was fired because she could not perform the essential functions of the job.  Moreover, she argues the Clinic caused the absence of a release by insisting that she could not come back to work with anything less than a full release free of all restrictions.  Similarly, she contends that her claim for complete disability was due to the clinic's insistence that she could not work without a full release.   Plaintiff argues she has presented sufficient evidence that Mowery

35

refused to make reasonable accommodation and that its termination of her employment was discriminatory.  She also argues these same arguments "are equally applicable" to her claim that Mowery retaliated against her for taking FMLA leave.

III. *Summary Judgment Standards*.

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A "genuine" issue of fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id*.  An issue of fact is "material" if it might affect the outcome of the suit under the governing law.  *Id*.

Under Rule 56, the moving party initially bears the burden of making a prima facie showing of the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law. *See Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir.1998). This burden may be satisfied by pointing to an absence of evidence on an essential element of the non-movant's claim.  *Id*. at 671 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party carries this burden, the opposing party cannot simply rest upon the pleadings; it must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  Because it is

36

the role of a jury to resolve any conflicts in the evidence, the court must examine the evidence on a motion for summary judgment in the light most favorable to the non-moving party. *Jones v. Unisys Corp*., 54 F.3d 624, 628 (10th Cir.1995).

When a plaintiff relies upon circumstantial evidence to support a claim of intentional employment discrimination, courts typically analyze the claim under the burden-shifting test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under that test, the plaintiff first has the burden of presenting evidence of a prima facie case showing that an "adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Kendrick v. Penske Transp. Services, Inc*., 220 F.3d 1220, 1227 (10th Cir.2000) (*quoting Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). To establish a prima facie case of disability discrimination under the ADA, a plaintiff must cite evidence that (1) she is disabled within meaning of the ADA; (2) she is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) her employer terminated her employment under circumstances that give rise to an inference that the termination was based on her disability. *See Morgan v. Hilti, Inc*., 108 F.3d 1319, 1323 (10th Cir.1997).

If a prima facie case is established, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action...." *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir.1999). If the defendant does so, the plaintiff can avoid summary judgment "only if she is able to show that a genuine dispute of material fact exists as to whether the defendant's articulated reason was pretextual." *Id*. To establish pretext, a plaintiff must cite evidence which could show either that "a discriminatory reason more likely motivated the

37

employer or ... that the employer's proffered explanation is unworthy of credence." *Burdine*, 450

U.S. at 256.  *See also Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 147-48 (2000).

"A plaintiff may accomplish this by revealing such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

a reasonable factfinder could rationally find them unworthy of credence."  *Morgan v. Hilti, Inc*.,

108 F.3d 1319, 1323 (10th Cir.1997) (quotation and citation omitted).

IV.  *Discussion*.

The ADA prohibits discrimination against "a qualified individual with a disability

because of the disability of such individual [.]" 42 U.S.C. § 12112(a).  "Discrimination" includes

not making reasonable accommodations to the known physical limitations of an otherwise

qualified individual.  *Id*. § 12112(b)(5)(A).  A "qualified individual" with a disability is one who

"with or without reasonable accommodation, can perform the essential functions of the

employment position." 42 U.S.C. § 12111(8).

Defendant does not challenge the fact that Ms. Dreiling has a disability.  Accordingly, the

court turns to whether there is evidence that plaintiff could, with reasonable accommodations,

perform the essential functions of the phlebotomist position.

Essential functions are "the fundamental job duties of the employment position the

individual with a disability holds or desires.'" *Martin v. Kansas*, 190 F.3d 1120, 1130 (10th

Cir.1999) (quoting 29 C.F.R. § 1630.2(n)(1)).  Job functions must "bear more than a marginal

relationship to the job at issue" to qualify as essential.  *Mathews v. Denver Post*, 263 F.3d 1164,

Under the ADA, consideration is to be given the employer's judgment as to what functions are

essential.  42 U.S.C. § 12111(8).  If an employer has prepared a written description before

38

advertising or interviewing applicants for the job, the description shall be considered evidence of the essential functions of the job. *Id*. A job function may be considered essential (among other reasons) because the position exists to perform that function; because of the limited number of employees available among whom the performance of the function can be distributed; or because the function is highly specialized such that the incumbent is hired for his or her expertise or ability to perform it. 29 C.F.R. § 1630(n)(2). Evidence of whether a particular function is essential includes the employer's judgment; written job descriptions; the amount of time spent performing the function; the consequences of not requiring the incumbent to perform the function; the experience of past incumbents in the job; and the experience of incumbents in similar jobs. *Id*. § 1630.2(n)(3).

Plaintiff does not directly challenge the defendant's claim as to what are the essential functions of this position except to "respectfully suggest[] that Dr. Dennis's statement about the primary purpose of a phlebotomist shows that a majority of the functions of a phlebotomist were collateral to the core responsibilities as he stated them." Doc. at 17. When Dr. Dennis was asked to give his general understanding of plaintiff's job duties, it is true that he specifically mentioned the drawing of blood, the taking of samples, and the transporting of these items to the lab for testing, but such testimony does not imply that the other job functions claimed by defendant are marginal or non-essential. For example, the cleaning of equipment and of the work area bear more than a marginal relationship to the phlebotomist position and could reasonably be considered by defendant as a fundamental job duty. In fact, plaintiff testified that she performed most of the duties listed in defendant's job description and explained the relationship of those duties to her position. *Cf. Davidson v. America Online, Inc*., 337 F.3d 1179

(10th Cir. 2003) ("The question of whether a job requirement is a necessary requisite to employment initially focuses on whether an employer actually requires all employees in the particular position to satisfy the alleged job-related requirement.").  Plaintiff cites no evidence to contradict defendant's assertion that the essential functions of the phlebotomist position are those set forth in Mowery's published job description.

The uncontroverted evidence shows, as plaintiff argues, that at the time of her termination she was capable of performing many of the essential functions of the job, including preparing equipment, identifying and labeling specimens, instructing patients on collection procedures, communicating with patients, and entering patient orders in the computer.  Plaintiff has also cited evidence that with the use of a stool, and perhaps with some modifications to the work space, she would have been able to draw blood in a seated position from a significant number of patients.  *See* 42 U.S.C. § 12111(9) (Reasonable accommodation includes acquisition or modification of equipment).  But the uncontroverted facts also show that an essential function of the phlebotomist position was to handle difficult patients, including children who physically resist efforts to draw blood, elderly or infirm patients whose limitations require the phlebotomist to assist the person and adjust to various positions, and patients who become faint or unsteady and need physical assistance.  And plaintiff has cited no evidence that she could have adequately performed such duties with (or without) reasonable accommodation.  Plaintiff essentially argues that she could have done the job if Mowery had assigned someone else to help her, arguing that "phlebotomists routinely assisted each other with children and other patients that were hard to draw from."  Doc. 38 at 20.  The idea of accommodation is to enable an employee to perform the essential functions of his or her job.  *Mathews v. Denver Post*, 263 F.3d 1164, 1168 (10th

40

Cir.2001).  Plaintiff cites no evidence that she herself would have been capable of lifting or controlling a resistive child or bending or stooping to draw blood from a patient at a difficult angle.  Nor does she explain how she would have been able to physically assist and protect faint patients from injuring themselves, or how she could have handled the job during those times when there was only a single phlebotomist on duty.  What she is essentially arguing is that if someone else had been assigned to perform all of the physical tasks she could not do, then she would have been able to assist by performing the remaining functions.  Such job restructuring, however, is not considered a reasonable accommodation under the ADA. Under plaintiff's proposal, some of the essential functions of her position would have been reassigned to other employees, with these other employees bearing the burden of dealing with physically difficult patients.  "Although job restructuring is a possible accommodation under the Disabilities Act, '[a]n accommodation that eliminates the essential function of the job is not reasonable.'" *Frazier v. Simmons*, 254 F.3d 1247, 1261 (10th Cir. 2001) (*quoting Smith v. Blue Cross Blue Shield of Kansas, Inc.*, 102 F.3d 1075, 1076 (10th Cir.1996)).  The obligation to make reasonable accommodation may require an employer to restructure a job by redistributing nonessential, marginal job functions, but it does not require the employer to reallocate essential functions.  *Cf. Frazier*, 254 F.3d at 1261 (reassigning essential functions to another investigator in the office or other state employees is not a reasonable accommodation).

Plaintiff's physician, Dr. Davis, testified that he would have been willing to let plaintiff try a sitting job as long as she didn't have to stand, bend, turn, or twist.  Davis Depo. At 53-54. His testimony shows that he "knew what her job was" and "knew she couldn't do her job at that point."  He told her that if she had to "stand the way the techs normally do, it's going to be

dangerous." *Id*. at 53.  He knew she would "have to do a lot of turning and reaching and walking and I didn't think her gait was steady enough or secure enough to do that without the risk of falling." *Id*. at 23.  If the essential functions of the job could all have been performed from a stationary seated position, then plaintiff likely could have performed the job.  But the uncontroverted facts show that the essential functions required a phlebotomist to not only stand, bend, turn and twist at times, but also to lift, restrain, or physically assist patients.  Because there was no reasonable accommodation that would have allowed plaintiff to perform these functions, she was not a "qualified individual" within the meaning of the ADA, and the defendant's failure to provide accommodation did not constitute unlawful discrimination.  While the ADA focuses on eradicating barriers, it does not relieve a disabled employee from the obligation to perform the essential functions of the job.  "To the contrary, the ADA is intended to enable disabled persons to compete in the workplace based on the same performance standards and requirements that employers expect of persons who are not disabled."  29 C.F.R. Part 1630, Appendix.

Plaintiff asserts that Dr. Davis would have provided her a release to go back to work but did do so not because the Clinic "would not let Camille come back to work without a full release."  As an initial matter, this argument overlooks the actual testimony of Dr. Davis, who testified that he would have released Ms. Dreiling for work that did not require her to stand, bend, turn or twist.  His testimony makes clear that he would not have released her for a job requiring all of the essential functions of the phlebotomist position at Mowery.  Moreover, plaintiff's assertion appears to be based on a slight exaggeration of the Clinic's response to her assertion that she could perform the job sitting down.  The evidence shows that the Clinic would not allow plaintiff to go back to work as a phlebotomist without a release stating that she could

perform the functions it considered essential – including the walking, bending, twisting and turning necessary to handle patients – but there is no evidence to reasonably support a finding that the Clinic would not allow her to go back to work without a release free of any and all restrictions whatsoever.  *See e.g.* Speilman Depo. At 86-88.  The record is clear that plaintiff believed she could do the job from a seated position and wanted to give that a try.  That willingness was commendable given the calamity with which she was stricken, and it shows a measure of her determination.  But the medical evidence shows she was not able, even with the accommodation of sitting, to perform all of the essential functions of the phlebotomist job.  Nor has plaintiff cited any evidence that there were any vacant sedentary jobs available to which she might have been reassigned.  *Cf. Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242, 1252 (10th Cir. 2004) (duty of reasonable accommodation may require employer to reassign qualified individual to vacant position); *Frazier v. Simmons*, 254 F.3d 1247, 1261 (10th Cir. 2001) (summary judgment granted absent evidence of an appropriate vacant position).  In sum, plaintiff has failed to cite evidence to support the second essential element of a prima facie case of discrimination under the ADA.  As such, her ADA claim fails as a matter of law.

Plaintiff's final claim is that the defendant retaliated against her for exercising her rights under the Family and Medical Leave Act.  She appears to argue that summary judgment should be denied on this claim because the defendant has failed to present a non-discriminatory reason for her termination.  *See* Doc. 38 at 24; 21.

Retaliation claims under the FMLA are addressed under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green.  See Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007). To make out a prima facie case of retaliation under the FMLA, a plaintiff

must show that: (1) she engaged in a protected activity; (2) the defendant took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action. *Id.* This third prong may require a showing of bad intent or "retaliatory motive" on the part of the employer. *Id.* Where, as here, the plaintiff unquestionably exhausted her FMLA leave and was then terminated, it seems doubtful that an inference of retaliation could be said to arise from the proximity in time between the use of FMLA leave and the termination. *Cf. Campbell*, 478 F.3d at 1287-88 (a retaliation claim may be brought when the employee successfully took FMLA leave, was restored to her prior employment status, and was adversely affected by an employment action based on incidents post-dating her return to work). Even if plaintiff could establish a prima facie case, however, the defendant has offered a non-discriminatory reason for the termination and plaintiff has not shown a genuine issue of fact as to whether that reason was pretextual.

Plaintiff contends the defendant's explanation for her termination is pretextual, and hence suggestive of retaliation, for two reasons. First, she contends the Clinic would not let her come back without a full and unconditional release. But as noted previously, the record shows that the Clinic conveyed to plaintiff that she needed a release stating that she could perform all of the essential functions of the job with or without accommodation. She failed to provide such a release, and indeed the evidence shows that her doctor would not have released her to perform some of the essential tasks required for the phlebotomist position. Secondly, plaintiff argues pretext is shown because Dr. Dennis stated that plaintiff was terminated because she could not perform the essential functions of the job. Doc. 38 at 21. The court fails to see how this statement conflicts in any material sense with the Clinic's explanation that plaintiff was fired for

44

failing to provide a medical release showing she could perform the essential functions.  Such

testimony does not constitute evidence of pretext and does not reasonably give rise to an

inference of FMLA retaliation.  Accordingly, plaintiff has failed to show a genuine issue of fact

on her claim of unlawful retaliation, and the defendant is entitled to summary judgment on this

claim as well.

V.  *Conclusion*.

Defendant Mowery Clinic's Motion for Summary Judgment (Doc. 30) is GRANTED.  It

is Ordered and Adjudged that plaintiff Camille A. Dreiling shall take nothing, that the action be

dismissed on the merits, and that defendant Mowery Clinic, LLC, shall recover of the plaintiff its

costs of action.  The Clerk of the Court is directed to enter judgment accordingly.

The Motion to Withdraw Carolyn L. Matthews as attorney of record for the defendant

(Doc. 43) is GRANTED.

IT IS SO ORDERED this   28th   Day of September, 2007, at Wichita, Ks.


s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge